In the Matter of the     )
Extradition of          )
                          )          4:12 MJ 17 DDN
                          )
AVI ATIAS TO ISRAEL.     )

## MEMORANDUM AND ORDER

Pending before the court in this international extradition case are (1) the motion of the United States for an order detaining respondent Avi Atias (Doc. 9) and (2) the motion of respondent Atias for leave to conduct certain prehearing discovery (Doc. 22).

## BACKGROUND

Respondent Avi Atias was arrested in this district on February 7, 2012, upon a complaint filed by the United States in this District Court under 18 U.S.C. § 3184. Section 3184 authorizes the issuance of an arrest warrant for the apprehension of a person charged with criminal activity within the jurisdiction of a foreign government which has a treaty or convention with the United States for extradition. See 18 U.S.C. § 3184.

The complaint invokes the Convention on Extradition (Convention) between the United States and the State of Israel that went into effect on December 5, 1963 (Doc. 1-4, at 6-14), and the Protocol for Extradition (Protocol), that went into effect on January 10, 2007 (Doc. 1-4, at 18-29).

The complaint alleges that respondent Avi Atias is charged in Israel with several violations of the penal laws of Israel and that a warrant for his arrest was issued by an Israeli judge. The complaint states that extradition of Atias to Israel has been requested by the State of Israel. Upon this complaint, an arrest warrant was issued.

On February 7, 2012, following his arrest, Atias was brought before the undersigned for an initial appearance. (Doc. 2.) Further proceedings, including a detention hearing, were set for February 10, 2012. Upon motion of respondent Atias, the pending hearings were reset to February 13, 2012. (Doc. 7.) On February 10, 2012, the United States filed a motion for an order detaining Atias pending his extradition to Israel. (Doc. 9.) On February 13, 2012, the parties requested, and the

court granted, a resetting of the pending hearings to March 30, 2012. Further extensions of time were requested and granted for respondent Atias to file a motion for an order authorizing certain discovery efforts. Such a motion was filed on April 30, 2012. (Doc. 22.) Arguments on the discovery motion were heard on May 9, 2012. (Doc. 27.)

## **MOTION FOR DISCOVERY**

Respondent Atias seeks leave of court to engage in two discovery efforts in advance of his extradition hearing. Atias seeks the issuance of subpoenas for two presently sitting United States Senators, Senator Mitch McConnell of Kentucky and Senator Johnny Isakson of Georgia, to compel the Senators to testify about the vote by the United States Senate on the Protocol for Extradition that occurred on September 15, 2006. Atias argues that the Protocol was not voted on by the United States Senate in the manner prescribed by the Constitution of the United States.

Also, he seeks the production of evidence related to the allegations against him of criminal activity that form the basis of the Request for Extradition. Atias argues that he is entitled to the discovery of the underlying evidence pursuant to the Convention and the Protocol, because the court has inherent authority to order it, and because the discovery requests are relevant and limited in scope. He argues that the documentary allegations against him are inaccurate and contain omissions and misstatements.

### Subpoenas to the Senators

Atias cannot be extradited to Israel unless a valid treaty so provides. E.g. Argento v. Horn, 241 F.2d 258, 259 (2d Cir. 1957); cf. United States ex rel. Saroop v. Garcia, 109 F.3d 165, 168 (3d Cir. 1997). The Executive Branch of the United States Government is without authority to seize a fugitive from a foreign country and surrender him to that country without such a treaty. Valentine v. United States, ex rel. Neidecker, 299 U.S. 5, 8-9 (1936); 18 U.S.C. § 3184 ("Whenever there is a treaty or convention for extradition between the United States and any foreign government . . . . .")

Atias argues that the Protocol of Extradition between the United States and Israel is not a valid treaty, because it was not properly ratified by the United States Government under the law of the United

States.[1]  He argues this is the case because he believes there was not a constitutionally mandated quorum of Senators present on the floor of the Senate to legitimize the Senate's conduct of business on September 15, 2006, when it voted on the Protocol.[2]

Atias seeks the issuance of subpoenas for Senator McConnell and Senator Isakson to compel them to testify about their personal recollections of the vote by the Senate on the Protocol on September 15, 2006.

Atias argues that, regardless of what the Senate's official record states occurred, the CSPAN television recording of the Senate's session shows that a question arose on the floor of the Senate about the presence of a quorum, that a quorum call was effected by the Presiding Officer of the Senate, Senator Isakson, that the quorum call was interrupted by Senator McConnell, that the business of the Senate proceeded, that the vote on the Protocol was taken by a division vote, that the facial demeanors of Senators McConnell and Isakson, and a comment by Senator McConnell to Senator Isakson ("Very creatively done, Mr. President") indicated that, when the vote was taken and the passage of the ratification resolution was noted in the record, a quorum for conducting Senate business was in fact not present.  If this was true, Atias argues, the Senate did not give its advice and consent to the Protocol as the Constitution requires and the Protocol did not become a lawful basis for his extradition from the United States to Israel.

### CSPAN television record of September 15, 2006

The undersigned has reviewed the CSPAN television recording of the Protocol vote that Atias refers to.[3]  The relevant portions of the Senate

---

[1]Under the Constitution, the President has the "power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."  U.S. Const. Art. II, § 2, cl. 2.

[2]"[A] majority of each [Congressional House] shall constitute a quorum to do business . . . ."  U.S. Const., Art. I, § 5, cl. 1.

[3]See:  http://www.c-spanvideo.org/program/194317-1 (last viewed on June 18, 2012).  In the following text, the court will indicate the locations of relevant statements on the record by stating their chronological locations in the recording, which is two hours, thirty-four minutes, and thirty-four seconds long.

floor session on September 15, 2006, are described as follows.  At
approximately 2 minutes and 50 seconds into the CSPAN recording of the
Senate proceedings, Senator Mitch McConnell (as the Assistant Majority
Leader) announced the business of the Senate for that day and the next
several days.


00:03:21:   Senator McConnell:    "That will be the first vote of the
            week.  We are also attempting to clear some nominations and
            treaties for today.  And we hope to have an agreement on those
            for later this morning.  Mr. President, I wanted to make a few
            observations about the war on terror . . . .  Mr. President,
            I yield the floor."

00:10:50:   Presiding Officer:[4]   "The Democratic Leader is recognized."

            Senator Harry Reid:    "Thank you, Mr. President.  I think my
            friend, the majority whip, is talking about things that do not
            exist.  We have now in the Senate a bi-partisan agreement on
            how to approach the [issues relating to the war on terror] .
            . . ."

01:12:30:   Unidentified speaker: "A quorum is not present."

            Presiding Officer:    "The Clerk will call the roll."

            Clerk begins calling the names of Senators.

            [The quorum call continued for one hour, seventeen minutes,
            and ten seconds, until the following business occurred.]


02:29:40:   Senator McConnell:    "Mr. President."

            Presiding Officer:    "Majority Whip."

            Senator McConnell:    "I ask unanimous consent that further
            proceedings on a quorum call be dispensed with."

            Presiding Officer:    "Without objection."

02:29:49:   Senator McConnell:    "Mr. President, I understand there is a
            bill at the desk that is due a second reading."

            Presiding Officer:    "The Clerk will report."

            [The Clerk begins reading the title of a bill.]

            Senator McConnell:    "In order to place the bill on the
                                  calendar . . . ."

---

[4]Senator Johnny Isakson of Georgia.

- 4 -

Presiding Officer:     "Without objection."

02:31:10:   Senator McConnell:     "Now, Mr. President, I understand, I ask unanimous consent that the Senate immediately proceed to executive session to consider the following: nominations on today's executive calendar, No. 892, No.  895, No. 898, and No. 899.  I further ask unanimous consent that the nominations be confirmed and blocked, that motions to reconsider be laid upon the table, the President be immediately notified of the Senate's action, and the Senate then return to legislative session."

Presiding Officer:     "Without objection."

02:31:57:   Senator McConnell:     "Mr. President, I ask unanimous consent that the Senate proceed to executive session to consider the following treaties on today's executive calendar, Nos. 16[5] and 18.   I further ask unanimous consent that the treaties be considered as having passed through their various parliamentary stages up to and including the presentation of the resolution of ratification, that any committee conditions, declarations, or reservations be agreed to as applicable, that any statements be inserted in the Congressional Record as if read, and that the Senate take one vote on the resolutions of ratification to be considered separate votes.   Further, that when the resolutions of ratification are voted upon, the motion for reconsideration be laid upon the table and the President be notified of the Senate's action, and that following the disposition of the treaties the Senate return to legislative session.

Presiding Officer:     "Without objection."

02:32:48:   Senator McConnell:     "I ask for a division vote on the resolutions for ratification."

02:32:54:   Presiding Officer:     "All those in favor stand up and be counted.

02:33:00:   Presiding Officer:     "All those opposed stand up and be counted."

02:33:05:   [Brief, slight sound of chuckling by unidentified person.]

02:33:06:   Presiding Officer (with slight smile on his face):     "It is the opinion of the chair that two-thirds of the Senators present have voted in the affirmative.   The resolutions of ratification or agreements are agreed to."

---

[5]The court takes judicial notice of the fact that the treaty identified as item No. 16 on the Senate's executive session on September 15, 2006, was the "Protocol Amending 1962 Extradition Convention with Israel:109-03."  See http://www.foreign.senate.gov/treaties/details/109-03 (last viewed on June 18, 2012).

02:33:20:   Senator McConnell (with slight smile on his face):    "Very
            creatively done, Mr. President.  I ask unanimous consent that,
            when the Senate completes its business today that the Senate
            stand in adjournment . . . ."

02:34:32:   Presiding Officer:    "The Senate stands [in adjournment]."


### The Congressional Record

The Congressional Record journalistic record of the Senate's proceedings on the Protocol Amending the 1962 Extradition Convention with Israel on September 15, 2006, is more concise than the CSPAN recording indicates:


[Senator] McCONNELL.  Mr. President, I ask unanimous consent that the Senate proceed to consider the following treaties on today's Executive Calendar: Nos. 16 and 18.  I further ask unanimous consent that the treaties be considered as having passed through their various parliamentary stages, up to an including the presentation of the resolutions of ratification; that any committee conditions, declarations, or reservations be agreed to as applicable; that any statements be printed in the RECORD as if read; and that the Senate take one vote on the resolutions of ratification to be considered as separate votes; further, that when the resolutions of ratification are voted upon, the motion to reconsider be laid upon the table, the President be notified of the Senate's action, and that following the disposition of the treaties, the Senate return to legislative session.

The PRESIDING OFFICER.  Without objection, it is so ordered.

Mr. McCONNELL.  Mr. President, I ask for a division vote on the resolutions of ratification.

The PRESIDING OFFICER.  A division is requested.  All Senators in favor of the resolutions of ratification will stand and be counted.

    Those opposed will stand and be counted.

    On a division, two-thirds of the Senators present and voting having voted in the affirmative, the resolutions of ratification are agreed to.

    The resolutions of ratification are as follows:

[Treaty Doc. 109-3 Protocol Amending 1962 Extradition Convention With Israel]

    *Resolved (two-thirds of the Senators present concurring therein)*, That the Senate advise and consent to the ratification of the Protocol between the Government of the

United States of America and the Government of the State of Israel Amending the Convention on July 6, 2005 (Treaty Doc. 109-3).

Thereafter, the Senate took up Treaty Doc. 109-6, the U.N. Convention Against Corruption.  <u>See</u> 152 Cong. Rec. S9662 2006 (HeinOnline).

<u>Relevant events following the September 15, 2006 Senate vote</u>

On December 21, 2006, President George W. Bush issued his written ratification and confirmation of the Protocol, based upon the reported action of the United States Senate giving its advice and consent to ratification of the Protocol on September 15, 2006, "two-thirds of the Senators present concurring therein."  (Doc. 1-4, at 16.)

On January 10, 2007, the United States Department of State notified the State of Israel that the Government of the United States had completed all of its internal procedures for entry into force of the Protocol and that the Protocol will enter into force on January 10, 2007. (Doc. 1-4, at 15.)

On February 2, 2012, the United States filed a complaint seeking the extradition of Avi Atias from the United States to Israel, based upon the 2006 Protocol for Extradition between the United States and Israel. Atias was arrested on February 7, 2012, upon this complaint.

The United States has attached to the complaint a certified copy of the Convention on Extradition Between the United States and Israel, signed in Washington, D.C., on December 10, 1962.  (Doc. 1-4, at 7-14.)

Also attached to the complaint is a certified copy of the ambassadorial Note from the American State Department to the Israeli Embassy that the Government of the United States had "completed all of its internal procedures for entry into force of the [Protocol between the United States and Israel amending the Convention on Extradition of 1962]. Therefore, in accordance with Article 12(2), the Protocol will enter into force on the date of this note." (Doc. 1-4, at 15.)  The Note was dated January 10, 2007.  (<u>Id.</u>)

The ambassadorial Note to the Israeli government was based upon the Ratification of the Protocol Amending the 1962 Convention on Extradition between the United States and Israel.  President George W. Bush signed the Ratification instrument, a certified copy of which is attached to the complaint filed in this extradition action, on December 21, 2006.  (Doc.

- 7 -

1-4, at 16-17.)  The President's ratification instrument included his finding that "The Senate of the United States of America by its resolution of September 15, 2006, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty."  (<u>Id.</u>)

<u>**DISCUSSION**</u>

Atias seeks to test whether the Senate's action on September 15, 2006, complied with the Constitution when resolution on advise and consent was voted on.  Atias specifically argues:

> First, as the two known Senators present during the ratification vote on the Protocol, they have personal knowledge as to how many Senators were present during the proceedings and whether or not a valid quorum was present in order to do business.  If there were less than 51 Senators present, then the Senate was not authorized to do business and the vote on the Protocol would have been invalid.  If there were at least 51 Senators present, then the next question posed is whether or not they saw 34 Senators who voted in favor of the Protocol . . . to give valid advice and consent to the President for ratifying a treaty.

(Doc. 22, at 19.)

Atias argues that he should be allowed to question Senators McConnell and Isakson about their recollections on two facts.  He would ask each how many Senators were present on the Senate floor when the division vote on the Protocol was taken on September 15, 2006.  If there were the 51 needed to constitute a constitutional quorum, he would ask them whether or not they saw 34 Senators vote in favor of the Protocol (two-thirds of a minimum number constituting a quorum).  He would offer the Senators' testimony at the extradition hearing, hoping to prove that there were less than a constitutional quorum or less than the number to give advice and consent regarding the treaty Protocol.

The United States argues that whether or not the Protocol was lawfully voted on by the Senate is a political question outside the proper ken of the Judicial Branch of the United States Government, citing <u>Terlinden v. Ames</u>, 184 U.S. 270 (1902).  In <u>Terlinden</u>, the Imperial German Consul in Chicago sought the extradition of Gerhard Terlinden to the Kingdom of Prussia for committing various crimes of fraud.  The extradition was sought pursuant to the extradition treaty between the United States and the Kingdom of Prussia, dated June 16, 1852.  Terlinden

was arrested in the Northern District of Illinois.  He filed a petition for a writ of habeas corpus alleging in part[6] that no treaty for the extradition of fugitives existed between the United States and the German Empire.  This was because the 1852 treaty ended with the creation of the German Empire and the adoption of its Constitution in 1871, and because no extradition treaty existed between the United States and the German Empire or the Kingdom of Prussia since 1852.  The district court denied Terlinden's petition.  184 U.S. at 273.

The Supreme Court affirmed the decision of the district court.  Its path to that conclusion in some respects supports the position of Atias, and in others the position of the United States.  The Supreme Court spent much effort describing the history of the treaty relations between the Kingdom of Prussia, the German Empire, and the United States.  <u>Id.</u> at 282-88.  In describing whether the federal courts should ultimately decide whether the Kingdom of Prussia had the power to participate in the treaty relationship with the United States, the Court stated, "We concur in the view that the question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard."  <u>Id.</u> at 288.  The Court quoted Chief Justice Taney with approval:

> The treaty is therefore a law made by the proper authority, and the courts of justice have no right to annul or disregard any of its provisions, **unless they violate the Constitution of the United States. . . .**"

Id. at 288-89 (quoting <u>Doe v. Braden</u>, 57 U.S. 635, 657 (1853)(bolding added)).  Further, the Court stated, "In the United States, the general opinion and practice have been that extradition should be declined in the absence of a conventional or legislative provision."  184 U.S. at 289.  And finally:

> The decisions of the Executive Department in matters of extradition, within its own sphere, **and in accordance with the Constitution,** are not open to judicial revision, and it results that where proceedings for extradition, regularly and constitutionally taken under the acts of Congress, are pending, they cannot be put an end to by writs of habeas corpus.

---

[6]Terlinden also argued, among other things, that the extradition complaint did not allege an extraditable offense.  184 U.S. at 273.

<u>Id.</u> at 290 (bolding added).

All of that said, this court has limited authority to determine whether the asserted Protocol, as the required treaty basis for Atias's extradition, is extant under the Constitution.

<u>Presence of quorum on September 15, 2006</u>

Atias argues that there is a substantial basis for believing the Senate did not constitutionally act on the Protocol on September 15, 2006, and he wants the testimony of the two senators who might be able to prove his assertion.  From the record before it, Atias has failed to provide a basis for such an argument.

The record is entirely insufficient to indicate that the Protocol vote was not in compliance with the Constitution's requirements for lawful advise and consent by the Senate or for the presence of a quorum for the proper conduct of Senate business.  Atias's arguments are founded upon speculation that the interruption of the quorum call and the perceived jocular interplay between Senators McConnell and Isakson indicated they knew there was no quorum present. The record is bereft of any evidence that would persuade a reasonable person to speculate in that regard.

The rules of the Senate impliedly presume that, when the Senate is in session, there is a quorum of Senators present to conduct business unless the absence of a quorum is suggested.[7]  <u>See</u> Riddick's Senate

---

[7]Senate Rule VI regarding a quorum provides:

**QUORUM--ABSENT SENATORS MAY BE SENT FOR**

1.  A quorum shall consist of a majority of the Senators duly chosen and sworn.

2.  No Senator shall absent himself from the service of the Senate without leave.

3.  If, at any time during the daily sessions of the Senate, a question shall be raised by any Senator as to the presence of a quorum, the Presiding Officer shall forthwith direct the Secretary to call the roll and shall announce the result, and these proceedings shall be without debate.

4.  Whenever upon such roll call it shall be ascertained that a quorum is not present, a

- 10 -

Procedure: Precedents and Practices, S. Doc. 101-28, Quorum, at 1038 (http://www.gpo.gov/fdsys/pkg/GPO-RIDDICK-1992/pdf/GPO-RIDDICK-1992-11 1.pdf )(last viewed June 18, 2012). Atias's basis for questioning the constitutionality of such a rule is without foundation. The same practice of the Senate in its efficient operation is constitutionally buttressed by the express rule that, when the presence of a quorum for conducting business is expressly challenged, a quorum call may be made and until a quorum is present, no business other then recess may occur. Id.

Atias proffers that he has prima facie evidence that there was not a quorum present when the Protocol was voted on, because Senator Byron Dorgan of North Dakota challenged the presence of a quorum preceding the time of the Protocol vote. A careful review of the CSPAN record does not indicate who made the statement, quoted above, suggesting the absence of a quorum. Whoever suggested the absence of a quorum, in Senate floor proceedings, it is commonplace for the absence of a quorum to be suggested, which is followed by a quorum call, which is terminated by unanimous consent before the quorum call is completed. This procedure "permits the Senate to use the quorum call to obtain a brief delay to work out some difficulty or await a senator's arrival." See: http://www.senate.gov/reference/glossary_term/quorum_call.htm (last viewed on June 20, 2012).

Furthermore, in the treaty proceedings on September 15, 2006, Senator McConnell asked for a single division vote on two treaties, including the extradition protocol between the United States and Israel. This is not an unusual procedure when the Senate takes a final vote on

---

majority of the Senators present may direct the Sergeant at Arms to request, and, when necessary, to compel the attendance of the absent Senators, which order shall be determined without debate; and pending its execution, and until a quorum shall be present, no debate nor motion, except to adjourn, or to recess pursuant to a previous order entered by unanimous consent, shall be in order.

See http://www.rules.senate.gov/public/index.cfm?p=RuleVI (last visited June 18, 2012).

non-controversial treaty matters.[8]   The jocular interplay between Sen. Isakson and Sen. McConnell at the time of the division vote on the Protocol is entirely consistent with the Senate's usual proceedings. Atias's argument that the senators' demeanors and statements indicate that the Protocol vote occurred despite a lack of a quorum is entirely speculative and an insufficient basis for subjecting members of the Senate to provide information to the court pursuant to a subpoena.

<u>Alternative basis for finding Protocol in effect</u>

The Supreme Court recognized that, besides express operation of lawful creation, a treaty agreement may be recognized and enforced because the executive branches of government of the requesting and requested nations acted as though the treaty was in full force and effect.   Even if the court were to find that the Senate did not constitutionally give its advice and consent to the Protocol, the Protocol was enforceable, because the executive branches of the governments of the United States and Israel have acted as though the Protocol is and has been in full force and effect.  <u>See</u> <u>Terlinden</u>, 184 U.S. at 289-90; <u>see also</u> <u>Saroof v. Garcia</u>, 109 F.3d at 171-73; <u>cf.</u> <u>Reyes-Vasquez v. U.S. Atty. Gen.</u>, No. 3:07-CV-1460, 2007 WL 3342759, at *3 (M.D. Pa. Nov. 8, 2007).

The events described above regarding the international ambassadorial actions of the United States and Israel regarding the Protocol following the September 15, 2006 Senate vote, plus the communications and documents attached to the extradition complaint filed in this court for Atias's

---

[8]   See:  http://www.gpo.gov/fdsys/pkg/CPRT-106SPRT66922/pdf/CPRT-106SPRT66922.pdf.

In recent years, with the proliferation of roll call votes and the increasing number of treaties concluded by the United States, the Senate frequently has approved two or three treaties en bloc, with a single roll call vote covering all of them.   As noted, on occasion it also has used the alternative procedure of approving treaties by division vote.   In those instances the Presiding Officer asks the Senators present to indicate their position by standing to be counted and then announces his conclusion that at least two-thirds of those present have voted in favor of the resolution of ratification. On October 18, 2000, for instance, the Senate approved 33 treaties on diverse subjects by division votes.

<u>Id.</u>

extradition, establish beyond cavil that the Protocol is in lawful existence.  Atias's arguments to the contrary are insufficient as a matter of fact and law.[9]

Underlying evidence

Atias seeks production of 23 categories of information and documents, all of which, he argues, are either referred to in the State of Israel's Request for Extradition and its Affidavit in Support, or are evidence that supports the pending allegations.

The United States objects to the court ordering that this information be produced, because the documents attached to the government's complaint, i.e. the certified documents supplied by the State of Israel, are a sufficient basis for the court to find probable cause, and because the information sought by Atias challenges the credibility of the Israeli government's evidence.  The government's arguments for the rejection of Atias's request for prehearing discovery, while they reflect accurate statements of the law, do not entirely demean Atias's request for discovery.

First, the court must look to the language of the relevant treaty for the definition of "the evidence sufficient to sustain the charge."  See 18 U.S.C. § 3181.  See also Charlton v. Kelly, 229 U.S. 447, 460 (1913).  Article X *bis* of the Protocol, captioned "ADMISSIBILITY OF DOCUMENTS," provides that the documents supplied by Israel are admissible evidence in the extradition hearing.  (Doc. 1-4, at 24-25.)

However, the subject matter of Atias's request for prehearing discovery is not only the government's evidence, but evidence Atias may obtain to offer at the hearing in his own behalf.  In this regard, Atias's entitlement to discovery is limited by the well-established nature of international extradition proceedings.  These proceedings are intended to provide a basis for the presiding magistrate judge to determine whether or not there is probable cause to believe Atias committed the offenses alleged in the complaint.  E.g., United States v. Wiebe, 733 F.2d 549, 553 (8th Cir. 1984).  Nevertheless, the extradition hearing is not to be turned into a trial of the allegation on their merits.  Charlton, 229 U.S. at 462.

---

[9]Atias's argument that any anticipated use by the Senators of the Speech and Debate Clause of the Constitution, to bar their being required to respond to his subpoenas would be unfounded, is now moot.

The admissibility of hearing evidence is limited to that which is relevant to the probable cause issue.  <u>In the Matter of the Extradition of Handanovic</u>, 826 F. Supp. 2d 1237, 1239-40 (D. Or. 2011); <u>see also</u> <u>Oen Yin-Choy v. Robinson</u>, 858 F.2d 1400, 1407-08 (9th Cir. 1988) (holding the probable cause standard applies to each essential element of the crimes for which extradition is sought).   However, the scope of evidence to be offered on behalf of Atias is limited in extradition proceedings to that which "explains the requesting country's proof and excludes contradictory or impeaching evidence." <u>Handanovic</u>, 826 F. Supp. 2d at 1239; <u>see also</u> <u>Rios v. United States</u>, No. 10-2192 (PJS/FLN), 2011 WL 915162, at *3 (D. Minn. Feb. 24, 2011).

The court has inherent authority to order prehearing discovery. <u>Oen Yin-Choy</u> , 858 F.2d at 1407; <u>Handanovic</u>, 826 F. Supp. 2d at 1239-40.

Equally important, prehearing discovery is authorized by the 1963 Convention.  Article XII of the 1963 Convention states:

> If the requested Party requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information **shall** be submitted to it within such time as that Party shall require.

(Doc. 1-4, at 36.)  It is not a sufficient answer by the government to Atias's discovery requests that the United States does not have the requested information, because the Convention burdens Israel, not the United States, with providing the evidence or information required by the court.[10]

The relevance of the specific items of information Atias seeks is limited by the allegations in the complaint, the Request for Extradition, and the underlying Affidavit.


## Extradition complaint

The extradition complaint alleges that Atias violated certain specified penal laws of Israel, including:

> Penal Law, 5737-1977; Contravention of Lawful Direction (§287(a)); Theft (§384); Obtaining Anything by Deceit (§415(1)); Forgery (§418); Use of a Forged Document

---

[10]The term "Requested Party," as used in the Convention and in the Protocol, refers not only the Executive Branch of the Government of the United States but also the Judicial Branch, including the presiding Magistrate Judge.  <u>See</u> <u>Quinn v. Robinson</u>, 783 F.2d 776, 787 (9th Cir. 1986).

($420(2))¦, Impersonating Holder of Certificate ($441(i)); and
    Passport Forgery ($8(a)(5) of the Passport Law, 5712-1952).

(Doc. 1, at 1.)

    The complaint describes the facts upon which the Israeli arrest
warrant was issued for Atias thus:

        In July of 2003, a Stay of Exit Order was issued in
    Israel against Avi Atias due to his failure to pay alimony to
    his former wife.  In February 2004, Avi Atias, using the
    identity of his brother, Ofer Atias, obtained an Israeli
    passport and fled to the United States in violation of the
    Stay of Exit Order.

(Id. at 2.)


                      Request for Extradition

    Attached to the complaint is the Request for Extradition by the
Israeli Ministry of Justice (Request).  This document describes the facts
supporting the allegations that Atias violated the criminal laws of
Israel.  It does so with greater factual specificity than the complaint
filed by the United States.

    The facts are alleged in the Request thus:


**B.  The Facts of the Case**

On November 1, 1998, a stay of exit order (hereinafter: **"the
First Order"**) was issued by the Tel Aviv Family Court against
Atias, for not paying alimony to **Ms. Lilach Atias Ozarzon**
(hereinafter:  **"Lilach"**),  Atias's  divorcee,  and  to  his
children.  The First Order was issued by the Family Court in
order to guarantee the payment of alimony that had been agreed
upon between the couple.

3.    According to the Family Court's protocols, on November
8, 1998, the court dismissed the First Order on the condition
that Atias provide two guarantors for the payment of the debt.
Since the stay of exit order was rescinded, Atias was able to leave Israel but did not pay his debts to
Lilach and to his children, and left Israel.  Lilach was unable to recoup
payment from Atias's guarantors.

4.    According to the Family Court's protocols, between 1998
and 2003, Atias frequently traveled abroad, and often
travelled to the USA.  On July 16, 2003, Atias returned to
Israel.  Shortly afterwards, Atias asked the court to issue a
stay of exit order against him, thus releasing the guarantors.
Based on his request, a new stay of exit order was issued
against Atias on July 24, 2003 by the Tel Aviv Family Court
(hereinafter: **"the Second Order"**).

5.    Two months later, Atias requested the dismissal of the Second Order.  Atias claimed he was [] residing in the USA, and that for this reason the Second Order should be rescinded.  Atias's request was rejected on October 26, 2003, by the Family Court.  Atias requested to appeal the decision to the Israeli Supreme Court.  However, his request was rejected on December 31, 2003.

6.    On January 28, 2004 Atias approached the Israeli Ministry of the Interior and requested that a new ID card and a new passport be issued for him.  Atias claimed that he lost his ID and his passport.  The Israeli Ministry of Interior issued Atias a new Israeli passport (No. [xxxx]7154).

7.    On February 1, 2004 Atias again approached the Israeli Ministry of Interior, this time pretending to be his brother, **Ofer Atias** (hereinafter: **"Ofer"**).  The Israeli Police suspects that Atias presented his brother's ID card and, while pretending to be Ofer, claimed that he lost his passport.  He requested that the Ministry of Interior issue a new passport in the name of Ofer Atias.

8.    According to the investigation, the Ministry of Interior issued a new passport on behalf of Ofer Atias, Israeli Passport No. [xxxx]8170 (hereinafter: **"the Falsified Passport"**).  The Falsified Passport contains a picture of Atias.

9.    On February 9, 2004 Atias fled Israel to the USA using the Falsified Passport.  Atias has not returned to Israel since.

10.   As Atias is currently not in Israeli territory and has not been questioned in this matter, a criminal indictment has not yet been filed against him.  Upon his extradition to Israel, and after he is questioned by Israeli Police investigators, a criminal indictment is expected to be filed against Atias.

## C. Atias's Whereabouts

11.   In her statement to the Israel Police, dated August 6, 2004, Lilach stated that she suspected Atias left Israel.  Atias had previously stated, during the Family Court hearings, that his address was in Missouri, St. Louis, USA and that his telephone number is +1 ([xxx]) [xxx]-7895, and Lilach stated that she called Atias at this telephone number (Lilach did not remember the specific date of the call).  According to Lilach, Atias's wife answered the telephone and called Atias to answer the conversation.  Lilach heard Atias say "Hello", and then she hung up.  Lilach recorded their conversation and provided the recording to the Police.

12.   According to information provided by Interpol-Jerusalem, Atias entered Israel on July 16, 2003 and has not left Israel since.  Ofer is listed as having entered the United States on February 9, 2004.  However, Ofer is currently in Israel, and

has not left Israel. Ofer provided a statement to the Israeli Police in which he stated that his Israeli I.D. card has been stolen, and he believes the stolen I.D. card was used in order to issue a falsified passport. In light of the above, it is the belief of the Israel Police that Atias entered the United States using the Falsified Passport and that he has not left the country since.

13. Atias was recently located by the Immigration & Customs Enforcement (ICE) representative in Israel, who informed Interpol-Jerusalem on April, 2011, that Atias was located in Missouri, St. Louis, USA. [].

(Doc. 1-1, at 4-6.)

### Affidavit in Support of Request

The written affidavit of Attorney Ariela Segal Antler, the District Attorney of Tel Aviv, is filed in support of the complaint and the request for extradition.

Paragraphs 6 through 13 of the affidavit describe in similar words the facts set forth in the paragraphs that constitute the "Facts of the Case" portion of the Request for Extradition, quoted above. Paragraphs 14 through 35 describe additional evidence learned in the investigation by Israeli Police, beginning with Lilach filing her complaint against Atias with the Israeli Police. At that time, she provided the police her recording of Atias's voice in her phone call to Atias's telephone number in the United States. (Doc. 1-3, at ¶ 14.) At that time, the Israeli Police examined the evidence, found no basis to investigate further, because border control records did not indicate that Atias had left Israel, and closed the case. (Id. at ¶ 15.)

### Ofer's Statement to Israeli Police

On September 12, 2004, Ofer Atias filed a complaint with the Israeli Police, because when he tried to get a new ID card, he learned and told the authorities that a picture of his brother, Avi Atias, not a picture of himself was on the official record of his passport. (Id. at ¶ 22.)

In his statement to authorities, Ofer said he called a phone number in the United States and spoke with his brother Avi. In this conversation, Avi said he had fled Israel because he had been depressed and wanted to commit suicide; Avi said he felt his only option was for use a forged passport to enter the United States. (Id. at ¶ 23.)

Ofer told police that Avi had been living in the United States for ten years. He returned to Israel in 2003, but had a problem leaving

- 17 -

Israel due to the stay of exit order. "According to Ofer, Atias felt that he had to return to his family in the USA and took Ofer's ID card during one of his visits in Ofer's house." (Id. at ¶ 24.) Ofer told the police that he spoke with his brother every two months and that Avi lives with his wife, Aimee, in the United States, and works as a computer engineer. (Id. at ¶ 25.)

Ofer told the police that the signature, handwriting, and photo on the official Israeli form requesting the issuance of a passport are not his but Avi's. (Id. at ¶ 26.)

The affidavit of District Attorney Ariel Segal Antler also states that Ofer withdrew his complaint and the Israeli Police closed the file. (Id. at ¶ 27.)

### Case Against Avi Atias reopened in July 2005

However, following Lilach's request, on July 17, 2005, Israeli Police reopened the case. (Id. at ¶¶ 16, 27.) The police took additional statements from Ofer and Lilach, and analyzed documents of the Ministry of the Interior. (Id. at ¶ 16.) With this new information, further attempts to locate Avi Atias were made. (Id. ¶ 17.)

Lilach's statement recounted her earlier information. (Id. ¶ 19-21.)

Ofer's additional statement was that he did not assist Avi in escaping Israel. When he could not find his national ID card, he went to the authorities to get another. The ministry clerk told him that his ID had been stolen and fraudulently used to issue a passport. (Id. at ¶ 29.) Ofer thereafter filed a complaint with the Israeli Police. (Id. at ¶ 30.)

The District Attorney's affidavit further states that the Interpol-Jerusalem agency's information is that Avi Atias entered Israel on July 16, 2003, and has not left; rather, the official records indicate that Ofer is the person who left Israel for the United States on February 9, 2004. However, Ofer is now in Israel. The Israeli Police suspect that Avi Atias entered the United States using the forged passport. (Id. at ¶ 35.)

### Prehearing discovery sought by Atias

Avi Atias seeks prehearing discovery of the following items:

- 18 -

1. Any written statements and/or complaints made by Lilach Ozarzon to Israeli law enforcement regarding Avi Atias;

2. Any notes of interviews with Lilach Ozarzon kept by Israeli law enforcement;

3. Any written statements and/or complaints made by Ofer Atias to Israeli law enforcement regarding Avi Atias;

4. Any notes of interviews with Ofer Atias kept by Israeli law enforcement;

5. Any documents showing the existence of a valid Stay Order against Avi Atias issued by the Israeli family court;

6. Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with Avi Atias's application for a new ID card on or about January 28, 2004;

7. A copy of the new ID card issued to Avi Atias on or about January 28, 2004;

8. Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with Avi Atias's application for a new passport on or about January 28, 2004;

9. A copy of the new passport issued to Avi Atias on or about January 28, 2004;

10. Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with Ofer Atias's application for a new passport on or about February 1, 2004;

11. A copy of the new passport issued to Ofer Atias on or about February 1, 2004;

12. Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with Ofer Atias's application for a new ID card in 2004;

13. A copy of the new ID card issued to Ofer Atias in 2004;

14. A copy of the recorded conversation made by Lilach Ozarzon with Avi Atias that was turned over to Israeli law enforcement;

15. All border control police records showing the last entry into and exit from Israel for Avi Atias;

16. All border control police records showing the last entry into and exit from Israel for Ofer Atias;

17. All Interpol-Jerusalem records showing the whereabouts of Ofer Atias;

18. All Interpol-Jerusalem records showing the whereabouts of Avi Atias;

19. All document showing Avi Atias fled Israel to the United States using a forged passport on February 9, 2004;

20. The full text of all laws for which Avi Atias stands accused of committing in Israel;

21. The full text of the statute of limitations law in Israel;

22. A copy of all arrest warrants issued for Avi Atias; and

23. The original Hebrew version of the Request for Extradition and Affidavit in Support.

(Doc. 22, at 3-4.)

Atias seeks production of these items of information because they are referred to in the extradition Request or in the affidavit in support of the Request. Atias argues that this information will be relevant to the court's determination of the "proper weight to give to the allegations in the Request and Affidavit when conducting [the] probable cause analysis." (Doc. 22, at 4.)

Atias is not entitled to the breadth of discovery he seeks. Stated simply, he is entitled to offer evidence at the extradition hearing that explains, but does not contradict, the evidence offered by the government. The court's duty is to determine whether the evidence offered for extradition establishes probable cause, not whether such evidence is subject to a defense or is not credible when compared with that opposed to it. Such issues are left to the trial on the merits in the jurisdiction of the requesting party. E.g. Rios, 2011 WL 915162, at *3-4 (D. Minn. 2011).

With these standards in mind, the court concludes that items 5, 6, 7, 8, 9, 10, 11, 12, 13, and 22 are within the scope of information and evidence that would be admissible on behalf of Atias at the extradition hearing. The other items relate to issues of a defense to the charges or the credibility of the Israeli evidence. The court will direct the United States to report to the court in writing on or before July 11, 2012, when this information will become available to Atias.

## Motion for release on bail

The United States has moved for the prehearing detention of Avi Atias. (Doc. 9.) The federal Bail Reform Act does not apply to international extradition. In re Extradition of Sutton, 898 F. Supp. 691, 693-94 (E.D. Mo. 1995). Bail in such cases may be granted only where there are special circumstances. Id. at 694.

Atias argues that his release will not present a public danger or a risk that he will flee. These factors are not by themselves sufficient as special circumstances to warrant his release. Id. at 696. Atias argues other special circumstances exist here, because (a) he has a likelihood of success in this extradition proceeding, because he has not yet been formally charged in Israel and probable cause will not be shown; (b) there is a likelihood of success on the merits of his case in Israel because of the applicable statute of limitations; (c) the length of delay in seeking his extradition indicates that the State of Israel does not consider his extradition a priority; and (d) the novelty and uniqueness of his argument that the 2006 Protocol was not properly voted on by the Senate will likely result in delayed proceedings.

The court at this time, on the record before it, declines to assess factor (a), the strength of Israel's presentation against Atias in the extradition hearing to determine that it will not likely result in a determination of probable cause. As explained above, factor (b), whether Atias is likely to be successful in Israel because of the applicable statute of limitations, will not be an issue in these extradition proceedings, and is not a special circumstance for determining whether to release him. Also, factor (c), whether Israel delayed seeking his extradition because it did not consider extradition "a priority," is not a relevant factor; such is an internal policy issue for the State of Israel to decide. Factor (d), the issue of whether the 2006 Protocol was constitutionally voted on by the Senate, has been put to rest.

The court, however, is concerned about the lengthy prehearing passage of time being a special circumstance militating for release on bail. The court will take up this issue at a supplemental detention hearing on July 17, 2012 at 1:30 p.m.

## ORDER

For the reasons set forth above,

**IT IS HEREBY ORDERED** that a supplemental hearing on the government's motion for the prehearing detention of Avi Atias is set for **Tuesday, July 17, 2012, at 1:30 p.m.**

**IT IS FURTHER ORDERED** that the State of Israel, as the Party Requesting Extradition shall produce to the United States the following documents:

a.   Any documents showing the existence of a valid Stay Order against Avi Atias issued by the Israeli family court;

b.   Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with an application for a new ID card in the name of Avi Atias on or about January 28, 2004;

c.   A copy of the new ID card issued in the name of Avi Atias on or about January 28, 2004;

d.   Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with an application for a new passport on or about January 28, 2004 in the name of Avi Atias;

e.   A copy of a new passport issued in the name of Avi Atias on or about January 28, 2004;

f.   Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with the application for a new passport on or about February 1, 2004 in the name of Ofer Atias;

g.   A copy of a new passport issued in the name of Ofer Atias on or about February 1, 2004;

h.   Any documents and/or pictures submitted to the Israeli Ministry of the Interior in connection with an application for a new ID card in 2004 in the name of Ofer Atias;

i.   A copy of a new ID card issued in the name of Ofer Atias in 2004; and

k.   A copy of all arrest warrants issued for Avi Atias.

**IT IS FURTHER ORDERED** that, upon its receipt of such documents, the United States shall provide such materials to Avi Atias.

**IT IS FURTHER ORDERED** that, on or before July 11, 2012, the United States shall report in writing to the court the anticipated date for the production of the aforesaid discovery materials.

    /S/    David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on June 29, 2012.